UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STRATEGIC CAPITAL CORPORATION, *et* §
*al*, §
§
     Plaintiffs, §
VS. §   CIVIL ACTION NO. 4:08-CV-1651
§
NEW STRONG GROUP LIMITED, *et al*, §
§
     Defendants. §

## FINDINGS OF FACT AND CONCLUSION OF LAW

### Findings of Fact

1.   On April 19 and 20, 2011, the Court held a bench trial in the above styled and numbered case on the counterclaims for tortious interference with a contract filed on November 25, 2008, by New Strong Group Limited  (hereinafter referred to as "New Strong") against intervenors AP Boston, PC, Jose Mario Tovar, and Francis J. Fair (Doc. 49), against Power Marine, LLC (hereinafter referred to as "Power Marine")  (Doc. 50), and against Bell, Ryniker & Letourneau, P.C. (hereinafter referred to as "Bell, Ryniker")  (Doc. 51).

2.   The case on trial arose out of a Complaint in Interpleader filed May 23, 2008 by Strategic Capital Corporation and H. Malcolm Lovett, Jr. against New Strong  and KSES (USA) Inc.,[1] now known as Paredon, Inc. (hereinafter known as KSES) Doc. 1.   According to the Original Complaint in Interpleader, "By agreement of the parties, [Strategic Capital Corporation] was engaged as an independent third-party to oversee the wind down of KSES and to authorize

---

[1]  At the trial Michael Reiser, a representative of New Strong, testified that he was employed by KSES, which is an acronym for KS Energy Singapore, a shareholder in New Strong Group Ltd.  New Strong Group Ltd. was a shareholder in KSES (USA), Inc., New Strong's co-defendant in the original lawsuit.  KS Energy Singapore, also known as KSES will not be mentioned again in these findings.  All references to KSES will henceforth be references to KSES (USA), Inc.

disbursements from a discrete fund to pay certain expenses of KSES.  The balance of the funds was to be paid to New Strong."  Sometime before the interpleader was filed New Strong had "demanded that it be paid all of the remaining funds.  KSES (USA), Inc.. . .objected to New Strong's request and demanded that [Security Capital Corporation] continue paying expenses and not disburse any funds to New Strong." Doc. 1 at 2.   On June 18, 2008 the Court ordered the funds deposited in the registry of the court.  (Doc. 6).    New Strong and KSES filed cross claims against each other.  Docs. 4, 10, 34.

3.   On  September 4, 2008 Magistrate Judge Frances H. Stacy held a Rule 16 scheduling conference at which David R. Jones, attorney for the Plaintiff Strategic Capital Corporation and H. Malcolm Lovett, Jr.; Seth A. Nichamoff and Alicia P. Boston, attorneys for Defendant KSES; and Thomas W. Sankey, attorney for Defendant New Strong, appeared.  At that hearing New Strong argued to Judge Stacy that New Strong and KSES had entered into a settlement agreement at the end of 2007 "that has to do with 7.6 million that would go to an escrow agent, a liquidating agent.  And he was to pay specific creditors that were listed on Exhibit B to that settlement agreement and none others."  Doc. 30, (transcript of hearing before Judge Stacy) at 6-7.  New Strong further argued that those creditors had been paid and there remained in escrow $3.4 million, which was to come to New Strong.  New Strong had requested the money from the trust escrow agent, but KSES objected to the payment, and the money was interpled into the registry of the court.  New Strong argued that the contract was clear and unambiguous and that it was a simple matter to file within 30 days a motion for summary judgment to have the court determine to what party the money should be paid. *Id*.  As a result of this argument Judge Stacy agreed that "this will help clarify who ought to be a party if you do that." Doc. 30, at  9

4.   On October 7, 2008 Strategic Capital Corporation and H. Malcolm Lovett, Jr. were

dismissed from the case.  Doc. 19.

5.  On October 7, 2008 AP Boston, PC, Jose Luis Tovar, Sr., Jose Mario Tovar, and Francis J. Fair, all represented by KSES's counsel, Seth Nichamoff, filed an opposed motion to intervene Doc. 17.  On October 15, 2012 Bell, Ryniker & Letourneau, P.C. filed its opposed motion to intervene. Doc. 23.  On October 16 Power Marine, LLC filed its opposed motion to intervene.  Doc. 24.

6.  On  November 6, 2008, Magistrate Judge Frances H. Stacy, to whom the motions to intervene were referred for a ruling, held a hearing on the motions.  Seth Nichamoff and Alicia P. Boston appeared for KSES; Mr. Nichamoff also appeared on behalf of AP Boston, PC, Jose Luis Tovar, Sr., Jose Mario Tovar, and Francis J. Fair; Thomas W. Sankey appeared for New Strong; Robert P. Vining appeared for Power Marine; and John Geddie appeared for Bell, Ryniker.

The parties moving to intervene argued that they should be allowed to intervene in the interpleader so that they could protect their interests in the funds filed in the registry of the court by responding to the motion for summary judgment (Doc. 15) that New Strong had filed October 2, 2008. Doc. 48 (transcript of November 6, 2008 hearing before Judge Stacy). New Strong's motion for summary judgment was one of pure contract construction, and it argued that if the motion for summary judgment were granted there would be no necessity for intervention of the parties.  New Strong further argued that had the intervenors not been granted an extension of time until December 21, 2008 to respond to the motion for summary judgment, the ruling could have been made, and the case might already be over.

Judge Stacy asked Power Marine why it should be allowed to intervene in the interpleader because Power Marine was not privy to the settlement agreement or to the motion for summary judgment filed by New Strong.  Mr. Vining argued for Power Marine

> . . . I think it's a little premature to deny our motion to intervene to at least to allow us to see what's contained in there. . .so that we can have a full benefit of what's in there, response [sic] to the --he may be right, maybe the settlement agreement does not encompass claims that we might have.  But not being able to look at those documents and fully address them we're at a disadvantage.  We believe that we are included in that settlement agreement and the legal fees that are being incurred, any damages that might be, that Power Marine might be responsible for I believe was contemplated in that settlement agreement, and we ask that Your Honor allow us to intervene, allow us to review those documents and respond appropriately.

Doc. 48, at page 15-16

Mr. Geddie, representing Bell,Ryniker, argued, "How can you say you privately [are] going to determine my rights without me having a say-so in it.  That just doesn't make any sense.  It seems if my rights are being determined I should be able to speak on the matter and I can't do so if I'm not allowed to intervene."  Doc. 48, at page 21.

Judge Stacy then asked Mr. Geddie, "Were you a party to the settlement agreement?  No?"  Mr. Geddie answered that he did not know.  Then an unidentified male speaker said, "They are a third party beneficiaries [sic.]"  Mr. Vining on behalf of Power Marine then responded "We're third party beneficiaries of the contract.  Our names were specifically mentioned in the contract, in the settlement." *Id.*

7.  In order, as she said at the conclusion of the hearing, "to allow them to . . .put their two cents in and make a response to [the] motion for summary judgment," Judge Stacy granted the motions to intervene on November 6, 2008. ( Doc. 48, at page 23 and Docs. 36, 38, 40). The complaints in intervention were filed the same day.

8.  New Strong answered the interventions (Docs. 45, 46, 47) and filed counterclaims (Docs 49, 50, 52) for declaratory relief that also raised claims for damages for breach of contract (against Jose Luis Tovar, Sr.) and intentional interference with the settlement agreement (also

referred to hereinafter as "the second settlement agreement" and "the contract") against Jose Mario Tovar, Francis J. Fair, AP Boston, PC, Power Marine, L.L.C., and Bell, Ryniker & LeTourneau, P.C.) and intentional interference with the escrow agreement (against Jose Mario Tovar, Francis J. Fair, AP Boston, PC, Power Marine, L.L.C., and Bell, Ryniker & LeTourneau, P.C.).

     9.   On April 24, 2009 the Court granted New Strong's Motion for Summary Judgment (Doc. 84) and declared that the unambiguous contract, that is, the settlement agreement, required payment from the escrow account of only "[t]hose amounts contemplated by Exhibit B. . . that could be directly linked to the dollar estimates provided on Exhibit B itself."  Doc 84, at 12. The Court further found

> [T]he liabilities arising from and associated with the class action lawsuit against Power Marine for which KSES may be liable under the Operating Agreement are excluded because they were unforeseen and in the future at the time Exhibit B was draw up. This also excludes the plaintiffs of the class action lawsuit against Power Marine, who cannot be construed as Settlement Agreement No. 2 creditors.  This will additionally exclude director's fees, litigation costs and legal counsel that arose because KSES advised SCC to delay payment to New Strong.

Doc. 82 at 12

     10.   The Court declared that because the sums contemplated by Exhibit B had been paid, all conditions precedent to release of the funds escrowed pursuant to the settlement agreement had been satisfied, and New Strong should be paid the remainder of the funds in the registry of the court.  The Court implicitly denied the Intervenors' claims to the funds as third party beneficiaries of the contract.

     11.   The Court further denied New Strong's motion for summary judgment for breach of contract of the settlement agreement and breach of contract of the escrow agreement.  The Court denied the motion of the Intervenors for partial summary judgment (Doc. 70) seeking dismissal

of New Strong's claim of tortious interference with contract on the grounds of judicial privilege and seeking dismissal of New Strong's claim for breach of contract against Jose Luis Tovar, Sr. on the grounds of corporate privilege.

12.   The Court granted New Strong's motion for release of the escrowed funds from the registry of the court on July 13, 2009, (Doc. 111), and the funds were disbursed to New Strong on July 31, 2009.

13.   New Strong's witness, Michael Reizer, testified at trial that after the interpleader was filed there was no reason why a ruling on a summary judgment determining New Strong's entitlement to the funds could not have been had in a short period of time.   The filing of the interventions claiming entitlement to the funds resulted in a lengthy and complicated process, which deprived New Strong of a timely distribution of the funds and forced New Strong to incur additional attorney's fees.

14.   The claims in intervention of AP Boston, PC, Jose Mario Tovar and Francis J. Fair were filed by an attorney on their behalf.   AP Boston, PC was a law firm hired by KSES to handle legal matters in connection with the sale of the DIXIE PATRIOT and the wind down of KSES.   AP Boston, PC. filed its intervention in the interpleader action for attorneys fees not contemplated by the contract and incurred by KSES after it had been executed.   The attorney, Alicia P. Boston, who provided the legal services testified that she had been paid the fees contemplated by the settlement agreement, but that she was owed additional fees incurred by KSES.   She testified that she did not invoice New Strong for payment of these additional fees, but KSES.   AP Boston, PC filed the intervention to recover these additional fees from the proceeds of the sale of the DIXIE PATRIOT, although Alicia Boston was well aware, having participated in the drafting of the settlement agreement, that her firm was not entitled to

additional fees from the remaining proceeds.

14.   Jose Mario Tovar, and Francis J. Fair were directors of KSES.  In the settlement agreement they were allocated from the proceeds of the sale of the DIXIE PATRIOT certain enumerated sums for director's fees, which they were paid.   Nevertheless, they filed an intervention in the interpleader action claiming additional sums owed them as director's fees for services performed after the contract was executed, that were not contemplated by the contract. Jose Mario Tovar testified that he was promised that he would be paid for his services if he stayed on as a director of KSES after the DIXIE PATRIOT was sold.  He did not testify that New Strong had promised to pay the sums he was owed out of the contract's escrowed funds. He merely testified that he expected to be paid for the services he was asked to perform and if the funds interpled in the registry of the court were the funds from which he was to be paid, he expected to be paid from those funds.

15.   Francis Fair testified that he intervened in the lawsuit to seek payment of his outstanding director's fees from the funds interpled in the registry of the court because Luis Tovar, President and a Director of  KSES,  told him if he stayed on as a director during the wind-down, he would be paid, although he was not sure from where the funds to pay him would come. In Mr. Fair's deposition he had testified that he had not reviewed the motion to intervene or the complaint in intervention before it was filed and did not know he had a claim in the case.

16.   Bell, Ryniker & LeTourneau, P.C. (hereinafter "Bell, Ryniker") was the admiralty firm hired by KSES to assist in the sale of the DIXIE PATRIOT and the wind-down of the corporation, KSES.  Bell, Ryniker called as its witness in defense to the tortious interference claim Douglas Shoemaker, the attorney who filed the intervention for Bell, Ryniker.  Mr. Shoemaker testified that he filed the intervention to recover attorney's fees and that he was

originally retained by Alicia Boston to represent KSES in the sale of the DIXIE PATRIOT, specifically, with the maritime law aspects of the sale.  At that point he did not know who New Strong was.  For that work, he testified, the firm was paid in full.  Later, he testified, he was retained to give separate presentations, first to the board of KSES and then to New Strong concerning claims that Power Marine and the *Myers* Plaintiffs[2] might have against KSES, New Strong, and the remaining proceeds of the sale of the DIXIE PATRIOT. [3]  On cross-examination by Power Marine, Mr. Shoemaker testified that the first time he heard of the class action lawsuit involving the DIXIE PATRIOT he was sent an email by Alicia Boston asking to retain him for legal advice concerning the *Meyers* lawsuit filed in the Western District of Louisiana of which KSES had become aware.  He testified that he was not paid the $5,750.00 in fees incurred for this representation, and he never invoiced New Strong for those funds

17.  Mr. Shoemaker testified that he learned about the interpleader action when he was at the federal courthouse for a conference on another case.  As he was leaving the courthouse he saw Alicia Boston going into the courthouse.  He was surprised to see her there and asked her what proceeding she was attending.  Ms. Boston told him about the Strategic Capital Corporation interpleader action and told him that in order to be paid he would need to intervene in the case.  She invited him to attend the conference, but because Bell, Ryniker was not a party he was not interested.  Ms. Boston told him he was owed fees, but at that point Mr. Shoemaker testified he

---

[2] After the settlement agreement was executed and the DIXIE PATRIOT sold, generating the funds placed in escrow with Strategic Capital Corporation, the remainder of which were subsequently interpled in the registry of the court, a class action lawsuit, *George Myers v. BP, et al.,* Civil Action 08-168 was brought in the United States District Court for the Western District of Louisiana.  The class action lawsuit involved the vessel, DIXIE PATRIOT.  In the second amended complaint in that suit, Power Marine was named as a defendant.

[3] On direct by Bell, Ryniker's attorney, Mr. Shoemaker testified that he prepared a presentation given separately to KSES and New Strong on their potential liability exposure under maritime law in the lawsuit that had been filed in Louisiana.  Both presentations were given at the offices of Bracewell and Giuliani.  Hang Te of New Strong participated by telephone at the second presentation, and New Strong's attorney,  Joel Ephross of the Duane Morris law firm, participated in person.

did not know if Bell, Ryniker was owed any money.

18. Mr. Shoemaker returned to his office and determined that he was owed attorney's fees. He then pulled up the interpleader action on Pacer. He reviewed the complaint and New Strong's answer to determine what the interpleader was about. He saw referenced in paragraphs seven and eight of the interpleader an agreement that creditors and wind-down costs were to be paid. He understood from these paragraphs that there were funds available to be paid to the creditors and that the funds had been generated by the sale of the DIXIE PATRIOT, in which Bell, Ryniker had participated. Mr. Shoemaker understood from his review of paragraph fifteen of the interpleader that there were a number of potential claimants to the fund whose due process rights Strategic Capital believed should be protected. Because Bell, Ryniker had not been paid for its work on the second retention, he understood that his firm was perhaps one of the entities who was a creditor of KSES who could be paid from the fund. After that review he asked a paralegal to prepare for his review a complaint in intervention to recover the attorney's fees. Subsequently he filed the motion to intervene, which was granted. The complaint in intervention copied sections from the AP Boston, PC, Tovar, and Fair complaint in intervention, which Mr. Shoemaker characterized as a template.

19. Mr. Shoemaker testified that he filed the complaint in intervention solely because there was an outstanding fee to be paid, and, based upon what Ms. Boston told him and his review of the complaint in interpleader together with the answer to the complaint in interpleader, he believed the funds interpled in the registry of the court were the appropriate source of Bell, Ryniker's fee payment. At the time he filed the motion to intervene he had never seen the second settlement agreement and knew nothing about that agreement or Exhibit B to the agreement.

20.   Power Marine testified by deposition through its corporate representative John Powers.  Mr. Powers testified that after KSES purchased the DIXIE PATRIOT, Power Marine was hired to operate the vessel, that is, to man the vessel and to find work for the vessel, from the fourth quarter of 2005 until the fourth quarter of 2007.

21.   Mr. Power testified that he learned about the interpleader action from his attorney, David Bland.  He had never seen the two settlement agreements in late 2007 which sold the Dixie Patriot and distributed the proceeds of the sale of the vessel.  He believed the funds had been set aside to take care of the affairs of the DIXIE PATRIOT at the conclusion of the operating agreement between KSES and Power Marine.

22.   Mr. Powers further testified that at the time of the second settlement agreement, KSES owed Power Marine the sum of approximately one and one-half million dollars, which was paid to Power Marine.[4]

23.   The claims made in Power Marine's intervention in the interpleader arose from claims against Power Marine made in the *Myers* lawsuits filed in Louisiana.  The *Myers* lawsuit claims involved Power Marine's operation of the DIXIE PATRIOT during the period the vessel was owned by KSES.  These lawsuits were filed after the sale of the vessel and the payment to Power Marine of the funds contemplated by the second settlement agreement.

24.   Of the six original intervenors, four, AP Boston, PC,  Jose Luis Tovar, Sr., Jose Mario Tovar, and Francis Fair were or should have been well aware of the provisions of the settlement agreement, a simple and unambiguous contract, and also aware that they were not third party beneficiaries to the contract.  AP Boston, PC was an attorney for KSES; the two Tovars and Mr. Fair were directors of KSES.  All four were represented by KSES's attorney, Mr. Nichamoff.  These intervenors must have known they had no colorable claim to the funds in  the

---

[4] This sum was a line item reflected on Exhibit B of the contract.

registry of the court.  Nevertheless, they intervened in an interpleader action filed to determine which of two claimants were entitled to a discrete fund held in escrow pursuant to the settlement agreement.  Their presence in the lawsuit confused the issues and elongated the time necessary to conclude the case. Even after the Court's ruling on the summary judgment motions, motions to reconsider were filed. The Court can only conclude that the interventions were done for the purpose of delaying the payment to New Strong of the funds in escrow as contemplated by the contract.

25.   The two other intervenors, Bell, Ryniker and Power Marine were not parties to the settlement agreement and had never seen it before they sought to intervene in the case.  They maintained they were third party beneficiaries to the settlement agreement in their complaints in intervention before they had even seen the agreement.  After they saw a copy of the settlement agreement they still maintained their interventions, even though it must have been obvious to them that they were not third party beneficiaries to the settlement agreement and had no colorable claim to the interpled funds.

26.   Although many of the issues raised by the Intervenors in their interventions are identical to the issues raised in the interpleader case brought by Strategic Capital Corporation against New Strong and KSES, there remain discrete issues raised solely on behalf of the Intervenors, which caused New Strong to incur additional attorney's fees.

27.   After New Strong filed its motion for summary judgment (Doc. 14) in its effort to obtain a quick resolution of the interpleader, AP Boston, PC, Jose Luis Tovar, Sr., Jose Mario Tovar, and Francis J. Fair filed motions to intervene.  (Docs. 18, 23, 24.)   These intervenors also filed an emergency motion to shorten the submission deadline for the motion for leave to intervene or to continue the submission deadline for New Strong's motion for summary

judgment (Doc. 18).  New Strong filed oppositions to the motions to intervene and a motion for reconsideration of the granting of the emergency motion.  (Docs. (21, 22, 28).  New Strong also filed a surreply  (Doc. 26) to AP Boston, PC, Jose Luis Tovar, Sr., Jose Mario Tovar, and Francis J. Fair's  reply to New Strong's opposition to the intervention.  New Strong attended the hearing on these motions to intervene before Judge Stacy on November 6, 2008.  After the interventions were filed, New Strong participated in securing a protective order (Docs. 35 and 42) and filed answers to the interventions (Docs. 45, 46, 47).  Discovery on the interventions was then conducted. After the Court's ruling on New Strong's motions for summary judgment (Doc. 82) and for release of the funds in the registry of the court (Doc. 85) the Intervenors filed motions for reconsideration (Docs. 88, 90, 99) and replies (Doc. 105, 107) to New Strong's responses and sur-replies (Docs.100, 103,106).

28.  New Strong's trial exhibit 40 consists of the many invoices for attorney's fees and expenses submitted by its attorneys in this case.  The Court has reviewed exhibit 40 in conjunction with a review of the docket to ascertain attorney's fees paid by New Strong to defend itself against the interventions filed by the Intervenors.  Specifically, the Court has reviewed Invoices listed below in order to exclude any fees or expenses incurred to address issues raised by both KSES and the interventions.

    1435264 (November 13, 2008)  fees:  $27,372.50      expenses:  $ 467.40

    1440818 (December 5, 2008)   fees:  17,286.50      expenses:   216.20

    1446434 (January 9,2009)      fees: 33,454.00      expenses: 2,244.48

    1449197 (January 20, 2009)    fees:     453.60      expenses:  none

    145560 (February 9, 2009)    fees:  1,595.99      expenses:  none

    1461265 (March 11, 2009)     fees:    none      expenses:  none

| | | | |
|---|---|---|---|
| 1461278 (March 11, 2009) | fees:   none | expenses:  none |
| 1468554 (April 9, 2009) | fees:    690.00 | expenses:  none |
| 1476748 (May 12, 2009) | fees:  2,475.00 | expenses:  none |
| 1482336 (June 2, 2009) | fees:  4,460.00 | expenses:  315.25 |
| 1489900 (July 6, 2009) | fees:  none | expenses:  none |
| Total | fees: $86,191.60 | expenses:  $2,243.33 |

The Court is satisfied and finds by a preponderance of the evidence that the attorney's fees the Court has isolated in this manner were caused in fact by the filing of the interventions that constituted tortious interference with contract and are recoverable by New Strong as damages.

29.   No notice of the tortious interference claim was given before the counterclaim for tortious interference was filed on November 25, 2008.  Prejudgment interest ceased accruing on July 13, 2009, the date the interpled funds were released to New Strong.  The time between November 25, 2008 and July 13, 2009 is 231 days or .63288 of a year.

30.   Prejudgment interest at the rate of five percent on the amount interpled into the registry of the court, $3,375,709.27, for 231 days or .63288 of a year amounts to $106,820.94.

31.   While in the registry of the court, the interpled amount earned interest of $19,725.04.

32.   Deducting from the prejudgment interest owed under Texas law the amount of interest earned in the registry of the court, the Court finds that AP Boston, PC, Jose Mario Tovar, Francis J. Fair, Bell, Ryniker, and Power Marine, LLC. owe New Strong $87,095.90 as actual damages suffered by the delay proximately caused by these intervenors' tortious interference with the settlement agreement.

33.  Any finding of fact that should properly be deemed a conclusion of law is hereby so deemed.

## Conclusions of Law

1.  Citing the Texas Supreme Court case *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931,939 (Tex. 1991), the Fifth Circuit Court of Appeals held

> Under Texas law, a plaintiff claiming tortious interference with a contract must prove that (1) a contract subject to interference existed, (2) the defendant's act of interference was willful and intentional, (3) the defendant's intentional act was a proximate cause of the plaintiff's damage, and (4) actual damage or loss occurred.

*Personal Preference Video v. Home Box Office*, 986 F.2d 110, 111 (5th Cir. 1993)

2.  *Personal Preference*, citing *Victoria Bank* and *International Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1247, 1271 (5th Cir. 1991), cert. denied, 112 S.Ct. 936 (1992) set forth the exception to the rule

> [T]he defendant's interference is legally justified or excused if (1) the interference was done in a bona fide exercise of the defendant's own rights or (2) the defendant had an equal or superior right in the subject matter to that of the plaintiff.

*Personal Preference,* at 111.

*Personal Preference* went on to hold "The privilege of legal justification is an affirmative defense to a tortious interference claim." *Id.*, at 111-112.

3.  *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989) held that "The party asserting this privilege does not deny the interference, but rather seeks to avoid liability based upon a claimed interest that is being impaired or destroyed by the plaintiff's contract."  *Steiner* concluded "that the privilege of legal justification or excuse in the interference of contractual relations is an affirmative defense upon which the defendant has the burden of proof.

4. *Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210-211 (Tex. 1996) held that a claim of tortious interference with a contract can be defeated by proving that one's actions were justified or privileged, which is done by proving that one acted to further or protect one's own legal rights which were equal or superior to those of the opponent. One sued for tortious interference with a contract may also defend by proof that one acted in good faith to further or protect a colorable legal right, even though the claim ultimately proved to be mistaken. *Id.*, at 211.

5. The term "colorable right" "has been construed . . .as 'an appearance of right' which would lead others, 'without inquiry, to suppose' the existence of the right claimed." *Bennett v. Computer Associates International, Inc*., 932 S.W. 2d 197 (Tex. App. --Amarillo 1996), quoting *Cox v. Houston & T.C.R. Co*., 68 Tex. 226, 4 S.W. 455, 457 (1887)

6. The *Bennett* case goes on to hold

> This interpretation comports with the definitions given the word "colorable" in the sixth edition of *Black's Law Dictionary* and in *Webster's Third New International Dictionary*. According to the former, it means "having the appearance of truth," while in the latter, it means "seemingly valid and genuine [or] having an appearance of truth, right or justice. . . ." Thus we conclude, that a right is colorable if it appears, without further inquiry (that is, if it appears on its face), genuine, truthful, valid, or existing.

*Bennett* at 202

7. In interpreting *Texas Beef Cattle's* use of "good faith," in the tortious interference context, the *Bennett* case first reasons that in some cases "good faith" carries "indicia of reasonableness, that is, what one knew or reasonably should have known given the circumstances. In others it simply connotes "honesty in fact" without "questions of reasonableness." *Id*. *Texas Beef Cattle*, however, suggests that "personal motivation is not relevant" to the determination of good faith *Id*. *Bennett* holds that the case, closely read, has

"effectively eviscerated motive from good faith and left the concept to mean something akin to "'having [an objectively] well grounded and justifiable belief of a right.'" *Id.* at 202-203, quoting *Sakowitz, Inc. v. Steck*, 669 S.W. 2d 105, 107 (Tex. 1984).

8.   *Personal Preference* pointed out that although the question of justifiable interference is usually one for the finder of fact, "under Texas law, the interpretation of an unambiguous contract is a question of law" for the court.

9.   The Court held in its opinion on summary judgment that the contract at issue here, the second settlement agreement, was an unambiguous contract. Doc. 82

10.   The intervenors, AP Boston, PC, Jose Mario Tovar, Francis J. Fair, Bell, Ryniker, & Letourneau, P.C., and Power Marine, LLC. who were sued by New Strong for tortious interference are not immune from the suit merely because that tortious interference took the form of filing an intervention lawuit.  *International Shortshop, supra* held

> [W]e are not persuaded that Texas law provides for an *un*qualified privilege to file a lawsuit [emphasis in the original].  We see no principled basis for affording the bad faith assertion of rights any greater protection merely because the assertion of rights occurs inside the courthouse rather than on the courthouse steps or elsewhere.

*International Shortstop, Inc*. at 1269-1270.

*International Shortstop* quoted from *Hughes v. Houston Northwest Medical Center, Inc*., 680 S.W. 2d 838 (Tex.App.1984, error ref'd n.r.e.), *cert denied*, 474 U.S. 1020 (1985), which held "Litigation is a powerful weapon, and when instituted in bad faith for the purpose of causing damage or loss, it is a wrongful method of interference," *Id*., 1269, at footnote 12.

11.   The filing of the interventions interfered with the contract in that without the time delay and expense that resulted from the filing and prosecution of their interventions, the contract would have been performed as the parties to the contract contemplated.

12.  The Intervenors' interference can only be justified if it is based on a good faith and honest assertion of a right that facially appears to be legitimate and is based on objective evidence.  They must show that they had a good faith belief based on objective evidence that they had a legitimate right or claim.

13.  AP Boston, PC's filing of its intervention in the interpleader action was an interference with the contract not done as a bona fide exercise of its own rights.  Nor did AP Boston, PC have an equal or superior right in the funds that were the subject matter of the interpleader.  AP Boston, PC. did not have an objectively well grounded and justifiable belief that it had a colorable claim in filing its intervention.

14.  Jose Mario Tovar's filing of his intervention in the interpleader action was an interference with the contract not done as a bona fide exercise of his own rights.  Nor did Jose Mario Tovar have an equal or superior right in the funds that were the subject matter of the interpleader.  Jose Mario Tovar did not have an objectively well grounded and justifiable belief that he had a colorable claim in filing his intervention.

15.  Francis J. Fair's filing of his intervention in the interpleader action was an interference with the contract not done as a bona fide exercise of his own rights.  Nor did Francis Fair have an equal or superior right in the funds that were the subject matter of the interpleader. Francis Fair  did not have an objectively well grounded and justifiable belief that he had a colorable claim in filing his intervention.

16.  Bell, Ryniker's filing of its intervention in the interpleader action was an interference with the contract not done as a bona fide exercise of its own rights.  Nor did Bell, Ryniker have an equal or superior right in the funds that were the subject matter of the interpleader.  Bell, Ryniker did not have an objectively well grounded and justifiable belief that it had a colorable

claim in filing its intervention.

17.   Power Marine's filing of its intervention in the interpleader action was an interference with the contract not done as a bona fide exercise of its own rights.  Nor did Power Marine have an equal or superior right in the funds that were the subject matter of the interpleader.  Power Marine. did not have an objectively well grounded and justifiable belief that it had a colorable claim in filing its intervention.

18.   New Strong has established all of the elements of a suit for tortious interference:

(a)   New Strong has established that there is a contract subject to interference.  The settlement agreement, between KSES and New Strong, was an unambiguous contract, which the Court has construed at length in its opinion on summary judgment (Doc.82).

(b)   The actions of filing the interventions were willful and intentional acts.  They were done voluntarily and not by reason of accident or mistake.

(c)   The intentional acts of filing the interventions were proximate causes of damages to New Strong.

(d)   New Strong suffered actual damages of attorney's fees and loss of the full use of its money while the funds were in the registry of the court.

19.   The Intervenors have all failed to prove their affirmative defense of justifiable interference.

20.   "The basic measure of damages in an action for tortious interference with contract is the same as the measure of damages for breach of the contract at issue."  *Anderson, Greenwood & Co. v. Martin, et al.,* 44 S.W. 3d 200, 219 (Tex. App.--Houston [14[th] Dist.] 2001.  In this interpleader action, the interpleaded funds would be the damages recoverable, and New Strong has recovered them.  Recovery of the interpled funds, however, will not put New Strong in the

same position it was in before the tortious interference of the Intervenor's interventions occurred. New Strong incurred attorney's fees in defending against the interventions and lost the full use of its money during the delay in paying the funds caused by the interventions.

21.    In *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. National Development and Research Corporation*, 299 S.W. 3d. 106 (Tex. 2009) the Texas Supreme Court addressed the issue of attorney's fees as damages. *Akin, Gump* was a malpractice case in which the plaintiffs, National Development and Research Corporation (hereinafter referred to as "NDR") sued the law firm for improperly prosecuting a prior lawsuit.  The case addressed the issue of damages in such a case and specifically, *inter alia*, "whether a client may recover attorney's fees and expenses paid for representation in the prior case as damages in the malpractice case. *Akin, Gump* at 109.  The Texas Supreme Court held that "attorney's fees and expenses paid for representation in the underlying lawsuit may be recovered as damages to the extent they were proximately caused by the defendant's negligence." *Id.*  The instant case is not, of course, a malpractice case, but the Supreme Court's reasoning is applicable here.

The Supreme Court first accepted NDR's acknowledgment that "the general rule that a party may not recover attorney's fees for the litigation in which it is involved unless recovery is authorized by statute or contract." *Id.* at 119.  NDR argued, however that Texas should adopt the "tort of another" exception set out in the RESTATEMENT (SECOND) OF TORTS Section 914(2) (1979),  which allows "a party to recover attorney's fees when that party must, as a result of some other tort committed by another, bring or defend an action against a third party." *Id.* The Supreme Court declined to "address whether the exception set out in section 914(2) of the Second Restatement should be adopted as Texas law" because it concluded "the general rule as to recovery of attorney's fees from an adverse party in litigation does not bar a malpractice

plaintiff from claiming damages in the malpractice case for fees it paid its attorneys in the underlying suit." *Id.*

The Supreme Court went on to explain that the situation in *Akin,Gump* did not involve the American Rule as it prevails in Texas because NDR was not seeking to recover attorney's fees for prosecuting its malpractice suit against Akin Gump.   Rather NDR sought damages measured by the economic harm it suffered from Akin Gump's breach of its duty of care in prosecuting the previous underlying lawsuit in which NDR was sued by Panda Energy Internationl Corporation and its subsidiaries.   The Supreme Court expressed the issue at hand, "Thus unless there is some reason not to consider the Panda suit attorney's fees as damages in the malpractice suit, the question becomes an evidentiary one:  Does evidence support the jury's finding that $216,590 in attorney's fees and expenses were proximately caused by Akin Gump's negligence." *Id.* at 121.

In the instant case New Strong cannot recover attorney's fees for prosecuting its tortious interference case against the Intervenors, but it can recover damages measured by the economic harm it suffered from the Intervenors' intervention in the interpleader of funds to which they had no colorable claim under an unambiguous contract.   As in *Akin,Gump,* there being no reason not to consider the attorney's fees and expenses as damages, the question becomes an evidentiary one:  what amount in fees and expenses did the Intervenors proximately cause New Strong to incur in defending against the Intervenors' claims to the interpleaded funds?

22.  On March 25, 2010, after the Court granted Summary Judgment in favor of New Strong's claim to the interpleaded funds, the Court granted New Strong's motion for attorney's fees in the amount of $206,142.00, which consisted of $199,642.00 for attorney's fees as prevailing party in the interpleader action plus $6,500.00 in fees in connection with filing the

motion for attorney's fees.   (Doc. 121). New Strong is seeking the entire $206,142.00 in attorney's fees as damages in this tortious interference case, but *Akin,Gump* is clear that only the attorney's fees proximately caused by the tort can be recovered as damages.   "Proximate cause has two elements:  cause in fact and foreseeability." *Id.* at 122, citing *HIS Cedars Treatment Ctr. Of DeSoto, Tex., Inc. v. Mason*, 143 D.W. 3d 794, 798 (Tex. 2004).

23. *Akin, Gump* goes on to state, "Cause in fact must be established by proof that (1) the negligent act or omission was a substantial factor in bringing about the harm at issue, and (2) absent the negligent  act or omission ("but for" the act or omission), the harm would not have occurred.  *See Id.* at 799." *Akin, Gump* at 122.   The Supreme Court further cautions that "Causation must be proved, and conjecture, guess, or speculation will not suffice as that proof." *Akin, Gump* at 122, citations omitted.

24. This is a diversity case; Texas law governs.  Under Texas law the prevailing party is entitled to prejudgment interest, which is five per cent. *Halff Assoc., Inc. v. Warner Pacific Properties, LLC*, 2008 WL 3874673 *2  (N.D. Tex. August 13, 2008).  In *Johnson & Higgins v. Kenneco Energy, Inc*., 962 S.W. 2d 507, 529 (Tex. 1998) the Supreme Court of Texas reiterated its previous holding that "There are two legal sources for an award of prejudgment interest:  (1) general principles of equity and (2) an enabling statute."  (citations omitted).  Because the Texas statute, Chapter 304 of the Texas Finance Code applies to wrongful death, personal injury and property damages cases, it does not apply in this case.  TEX.  FIN. CODE Sections 304.101 and 304.103.   Rather *Johnson & Higgins* points to common law, as conformed to the statute. *Johnson & Higgins*, 962 S.W. 2d at 529.  Prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed.  *Id*. at 531. Further, it shall accrue at the rate for postjudgment interest and it shall be

computed as simple interest. *Id.* at 529.  In the instant case prejudgment interest began to accrue on the date the counterclaims for tortious interference was filed, November 25, 2008 (Docs. 49, 50, 51).

      25.  Any conclusion of law that should be deemed a finding of fact, is hereby so deemed.

    SIGNED at Houston, Texas, this 12th day of December, 2012.

                    MELINDA HARMON
              UNITED STATES DISTRICT JUDGE